We will take the case under advisement. Our fourth case for this morning is, I'm not sure how he pronounces it, Pytlewski v. Commissioner Saul. That is the correct pronunciation. Mr. Duncan. May it please the court. Dana Duncan on behalf of Paul Pytlewski. This case rests on the issue of the ALJ's hypothetical question as presented to the vocational expert and ultimately adopted as the residual functional capacity and whether it adequately encapsulated Mr. Pytlewski's mental impairments. And you're including prominently among these mental impairments his intermittent explosive disorder or whatever we should be calling this. That's correct. And as I, Mr. Pytlewski has at times been diagnosed as having anger issues, explosive anger issues, a personality disorder, an antisocial personality disorder, and at one point this was referred to by the UW psychiatrist as having or being sociopathic. So let me ask you this, Mr. Duncan, and it's not the end of the world if the answer is no, but was there ever any effort on anyone's part to track down some of these 30 jobs that he walked off of or did everybody just take his word for the fact that he had a very poor record of keeping a job? In retrospect, Your Honor, that would be something that should have been done and probably not. I do know from trying to obtain medical or employment records a lot of times they're very vague as to what took place because of the potential liability issues. So it'll just say ended work, so sometimes it's not worth the effort of doing it. But you can see just by reviewing his work history under the D section of the file that he had, I think I had counted 15 jobs in 15 years. And those are just the jobs that were reporting to the IRS. And there's no content that the D part is accurate, you know, no one said this is not right. Well, it is the IRS. I would hope they're accurate. Okay, Counsel, I have a question about Dr. Whalen's assessment. So his assessment was very good for a client, but I'm kind of mystified by the inconsistency between the September and November assessments, particularly in frequency and length of contact. He says in the first assessment, which was the September one, one hour evaluation and monthly for 30 minutes and as necessary for frequent crises. That seems like a pretty dramatic difference. Well, part of this, as I pointed out, Your Honor, was the fact that when he first came in to see Dr. Whalen, Dr. Whalen assumed he was not taking his medication. So we had him tested. And the lab reports came in about the time his opinion changed that showed that he had the therapeutic levels of Depakote that he was supposed to be taking. So now this behavior, which he assumed was unmedicated, is now in existence medicated. But I'm specifically asking about saying that his contact was simply basically an evaluation and a follow-up and then switching to monthly for 30 minutes. I'm asking about that. I understand your explanation for why his opinion changed, but I'm asking about the dramatic difference in his reporting and the frequency of treatment. I think he assessed that this person needed more help than what he had previously been given. So let me just rephrase this, because it does, if you look at line one of these two different forms, the September form and the November form, they don't really say the same thing. And now if the answer is that after, whatever the date is, September 22nd, he puts him on a monthly schedule for 30-minute appointments, he hasn't had very many of these, but that's what he's doing now. Maybe that reconciles these things. But he seems to be backward-looking because he says, as necessary for crises, parentheses, frequent. Frequent. Yeah. Well, I understand, Your Honor. I can't, and I would be speculating on my part to try to figure out exactly what he was saying by this, other than this is about the time that he started seeing Dr. Whelan on a regular basis and then eventually shifted over to the UW. But here's my problem, counsel. I mean, a big part of the ALJ's decision here was driven by discounting Dr. Whelan's opinion, which was really good evidence for your client. And it seems to me that there really are, and this date thing, you know, substantiates it too. I mean, these really are dramatically different assessments. They are. And the only thing I can point out is that, and I'm not faulting the ALJ or the decision writer who assisted in this or whatever. It took three or four members of my office to decipher the handwritten notes of Dr. Whelan during that period of time that I've cited in my brief, where he made specific findings. We had different people review them, trying to figure out exactly what it was. Basic penmanship apparently is not taught in psychiatric education. But anyway... Mr. Duncan, I have a similar concern, though, and here's the concern that I take away from it, is you have these really different opinions by Dr. Whelan. I mean, anybody looking at him, that's the very first impression they're going to get. The ALJ, of course, had that same impression. But the ALJ recognized that there's quite a lot of other evidence, if you will, that addresses, you know, the RFC aspect of this in particular. And what I'm thinking of, you know, there are the Dr. Benesch, is it Donna Hall or Donna Huell? Donna Huell. Donna Huell. Donna Huell. Phillips. Yep. You know, and others. So the ALJ seems to have, you know, resorted to that other evidence, which is pretty extensive. And one of the difficulties that I have with your argument is it seems like in the face of, you know, that which I just described happened, you're just asking us to kind of go back in and reweigh it a different way. No, Your Honor. And this is why. Because first of all, Dr. Benesch was a consultative examiner who was hired by Social Security and under the commissioner's regulations is entitled to more weight than Dr. Donahue or the other, and I'm nameslipsing here at the moment, Phillips, who never examined Mr. Petluski and who never reviewed probably about half of the medical record. Okay. What you need to focus on is Dr. Benesch had the evaluation done. He noted the angry outbursts, noted the problems. Then he goes and sees Dr. Weiland, who originally finds that he might be faking it. He uses the term that there might be some element of malingering. He has his girlfriend leave the room and whatever, and different stuff. And then ultimately changes his opinion. Then you have the UW doctors who review him afterwards who find it. The medical record in this case is kind of like a Russian nesting doll. You have to look, you have the outer side, and as they keep opening it, they find more and more and more until they finally say, this guy has some significant sociopathic problems that are not readily apparent. The fact that he is in a store, and apparently I can't decipher from the record whether it was working or just there, but punches out another person in the store because of a conflict. The reports of him walking off the job 20 times. Him having dreams about slashing people. These are all factors that came out only through the progression of the treatment that he had. The state agency doctors never reviewed anything in 2016 or 17 pertaining to this record. That being said, the ALJ still didn't even apply the findings of the state agency doctors because the eight or the criteria in section one of the mental RFC form, they marked things like his work pace, and those were not adequately addressed because, quite frankly, the fact that he's having these anger outbursts is disruptive to himself and to the workforce and would be the equivalent of an unscheduled break, which the vocational experts said would not be tolerated. So all of these factors come in here. So even if you look just at the findings that the judge did make regarding the state agency doctors, it's still insufficient because of that very reason. All right. I think you're about out of time. I'll reserve the rest of them. Thank you. Ms. Schwartz. May it please the court, I'm Allison Schwartz, and I represent the Commissioner of Social Security. This appeal is significant in that the ALJ issued an exceptionally thorough evidence-based decision. He considered- I hope that's not exception. All of the evidence, he explained his conclusions in detail, and he drew them all from the medical opinions and the record evidence. Why isn't it the case, though, taking Dr. Whalen, that a professional's initial assessment of somebody based, of course, only on whatever you can gather initially, couldn't change a couple of months later upon greater exposure to the person and a greater opportunity to evaluate that person? It seems to me that's what happened. You know, Mr. Pitluski goes to see him in September, and it's a rather preliminary inquiry. By a couple of months later, Dr. Whalen's thinking, whoa, this guy's really got serious problems. I invite the court to- Surely that can happen. I invite the court to look at Dr. Whalen's treatment records, which are in Exhibit 28F and explained in detail in the ALJ's decision. Dr. Whalen saw Mr. Pitluski eight times. Which is not an inconsiderable number. If you look at every single treatment note after, and I believe there are five, they all reflect normal findings. None of those treatment records have any resemblance to the absolutely extreme limitations in Dr. Pitluski's- Can I ask a particular question? In Dr. Whalen's opinion, yes. What I found odd was that the December 2016 treatment notes seem really at odds with November. So I thought that the kind of hypothesis that Judge Wood set out there, I thought that that was right. That Dr. Whalen, through greater exposure to this individual, recognized over time that he's got really serious issues. But then Dr. Whalen seems to pull it back the very next month. In December, in January, in February, and in March, where Dr. Whalen says, by the way, doing great. And in all of those treatment notes that I just identified, he said, good grooming, cooperative, good cognition, good memory, insight, judgment. So let me ask, could somebody bathe regularly and still have a problem with explosive, triggers is what makes me think of, with explosive behavior vis-a-vis others, coworkers, people that you encounter? I'm not sure I see the link. I can't speculate on that because in these treatment notes there's other findings in addition to just bathing regularly. All the stuff you just read off doesn't say to me anything about whether he could, if somebody challenges his way of going about a task and he blows up at them, maybe he's perfectly nice if you're just talking about the weather or the latest developments in Major League Baseball. But he's not under other circumstances. Well, you would expect the treatment notes to at least bear some resemblance to Dr. Whalen's opinion. If the doctor saw it in that situation. Pardon? Well, if the triggering thing happened. Well, he's not observing any triggering or reporting any triggering in any of these treatment notes. Would those notes be relevant to the bipolar diagnosis and to the antisocial personality disorder? Well, he was a psychiatrist, so that's what he was treating him for. So there's some reason to say. So you would expect it to come up. And the fact that Mr. Pieluski has mental impairments was not lost on the ALJ, but the ALJ was faced with the task of reviewing all of the evidence. So what did the ALJ do? The ALJ deferred to three medical opinions and formulated a mental RFC that is on all fours with those three medical opinions. How could someone ever show this explosive anger disorder, though? I mean, unless it happened to manifest while they're in the psychiatrist's office. How could they ever prove it? Because presumably they have periods of normalcy and then periods of explosion. Well, I can speculate about what would happen in another case. It's a very important question, though, because if the doctor didn't happen to observe it, then he's not going to put it down in his notes. But it doesn't mean it's not happening. Right. Well, I also think that the court needs to be aware of the fact that Mr. Pieluski's subjectively reported anger, which there's multiple instances of malingering, by the way, which we can discuss if you'd like, that evidence was not lost on the ALJ. But the ALJ balanced that evidence against all he had in front of him, which was the medical records, which showed on multiple occasions as set forth in our brief that he was cooperative. He was mild. The physical CE said he was mild-mannered and polite. He was respectful. But, you know, it's interesting. Power relationships sometimes work that way, that he would be deferential to a doctor, but a co-worker might be quite another thing. Well, you know, the ALJ has to weigh the evidence, and the ALJ was reasonable in this case faced with his subjective reports of his anger outbursts, which nobody observed, by the way. Well, there's no question nobody's disputing he went through 30 jobs, right? Nobody's conceding this. I mean, there's no we don't have any proof that he lost 30 jobs. We don't know. The ALJ considered this. What about this Part D that Mr. Duncan referred to? That's 15 jobs in 15 years. That's quite a bit of turnover, even if that's all it is. Well, that's part of the evidence. But the substantial evidence standard requires ALJs to look at the record as a whole. So he can't keep a job. And to be honest, I'm not sure what else the ALJ was supposed to rely on when he had three medical opinions plus a medical opinion from a trader saying no limitations. What does he do with the University of Wisconsin people? At the University of Wisconsin, he met with a psychiatrist. Now, what does the ALJ do with that evidence? Does the ALJ review that? There's no medical opinions there. The ALJ reviewed that evidence and pointed out, this was with a psychiatrist named Dr. Nashewitz, that Pytluski told Dr. Nashewitz that he was editing portions of his treatment notes because he wanted to make sure they were favorable to his disability plan. Right. Now, I know that the commissioner is relying a lot on this dissembling theory. Well, there's two other doctors who mention this as well. And there's other spots in the record that were not referenced in the ALJ's decision. The girlfriend giving testimony that was tailored to, you mean that too? Pardon? I'm sorry. The girlfriend's testimony. The girlfriend giving testimony that was tailored? Yes. This was with the consultative examiner. The girlfriend came in and spoke in very specific disability-related terms. And Dr. Benes questioned whether he was malingering also. But actually, there's one place where it says this is either malingering or a problem. And it's just an either-or. Well, the ALJ recognized that. But we have two other doctors. I mean, this is a case where we have three doctors mentioning malingering. I mean, for the ALJ not to at least take account of that. And how many of them are treating? How many of them have actually looked at him? All of them. I mean, one of them wasn't examining, but they all looked at him and examined him and saw him. And then you have the ALJ, who under BSTEC, we are supposed to defer to his determinations because he sees the hearing of close, who saw Mr. Pieluski testify. Now, I think it needs to be clear that the ALJ did not find that Mr. Pieluski had no limitations. The ALJ found that Mr. Pieluski had significant limitations, but crafted an RFC that was consistent with an ability to work. And in doing so, he relied on three medical opinions of record. Ms. Schwartz, can I shift gears and ask you just a brief question? I want to make sure that there's a couple places in your brief where you mentioned something, and I'm not sure I appreciate the significance of it, or I'm not sure I get it. You're talking about new regulations that have come into play with respect to mental impairment. Yes. And in particular, the different, like, five or six rating categories. And, you know, you're making the point that here this is the first case that our court is considering under these new regulations. What I'm not sure of is how do you translate that, or how does it extend to what we're doing here, or everything we're just talking about? Okay. I can see I'm running low on time, so if it's okay with you, I would like to quickly answer your question. Absolutely. Thank you. The new regulations have changed the mental impairment evaluation in some respects and clarified them in some respects. I would call the court's attention to the various cases where they have expressed concern that an individual with a moderate rating and concentration, persistence, or pace cannot sustain through an entire workday. The new regulations have clarified what a moderate rating means and has enunciated that a moderate rating means that someone's functioning independently, appropriately, effectively, and on a sustained basis is fair. If somebody has serious limitations or an inability to persist in a functional area on a sustained basis, the regulations clarify that such an individual would have a marked limitation. So with regard to the individuals mentioned in cases like Mishler, Radosevich, and Paul, where the court has been concerned that somebody might not be able to concentrate or persist through an entire workday, the regulations have clarified that, and that's the first time we have been able to explain this to the court, that those individuals would have a marked or extreme rating and probably get disability benefits. But a moderate rating, as this court has said before, does not equal a complete impairment. And the new regulations have clarified those lines of cases and have shown that a moderate rating is someone that can indeed persist. Does that answer your question? Thank you. Thank you very much. Thank you. I'll give you a minute and a half, Mr. Duncan, if you need it. Thank you. With due respect to counsel, the new regulations, 80 Federal Registry, and I'm drawing a blank as to the page number that placed these new regulations in, specifically states that they're not new, but just a clarification of longstanding interpretation of the rules. So this idea that this now resolves the medium or the moderate limitation doesn't because they define it as fair and marked as serious. Well, you could drive a Buick through the difference between a fair limitation and a serious limitation, and it's just done to try to circumvent the courts from all over the country saying moderate concentration, persistence, and pace has to be factored in, and why or how is the question. Ultimately, this case comes down to we have the ALJ who made simple routine and repetitive tasks, which he even referred to as being related to understanding and remembering instructions, the four cornerstones that the commissioner uses to assess this, understanding and remembering and carrying out instructions, concentration, persistence, and pace, working with others in adaption. He uses no fast-paced production work, which the court, by precedent to this circuit, it's not defined and it's not a shortcut for establishing it. Under the new OES system that's being in place, pace is going to be a factor that's going to be presented and it's not at all just a fast-paced. I'm out of time. Can I just finish one last point? Simple work-related decisions is adaption. Occasional workplace changes is adaption. Other than this fast-paced production, there's nothing that addresses concentration, persistence, and pace, and that's a finding that was made not just by the three doctors who treated, and you have to take into account the UW, even though there wasn't an opinion, the medical records provide what could be considered an opinion, not necessarily work, but of what his condition is, and address all of that. The state agency doctor said moderate limitations and said pace was a factor. It's not addressed. So thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.